UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
JUSTIN GOLDMAN,

                       Plaintiff,

   - against -

ADVANCE PUBLICATIONS, INC.,
ADVANCE DIGITAL, and ADVANCE
LOCAL,

                       Defendants.
------------------------------------------------x

COMPLAINT FOR
DECLARATORY JUDGMENT
AND COPYRIGHT INFRINGEMENT

JURY DEMANDED

## INTRODUCTION

1. The United States Copyright Act grants to all copyright owners the "exclusive right" to "display" their copyrighted works "publicly," 17 U.S.C. 106(5), and the Act defines "display" as "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially." 17 U.S.C. 101.

2. In this case, plaintiff Justin Goldman ("plaintiff") is such a copyright owner and the defendants ("Advance") are owners of popular for-profit general-interest websites that showed his copyrighted photograph publicly without his knowledge or consent. (Reproductions of those displays are set forth on pages 4 and 5 below.) For that reason, he brings this action for

infringement of that copyrighted photo.

3. Advance claims legal absolution for those infringements by invoking a never-before-asserted in court, much less adjudicated, interpretation of and extrapolation from a single 2007 Ninth Circuit decision that did not remotely involve underlying facts that are even arguably analogous to the facts here. Only for that reason is this case (ostensibly) one of first impression in U.S. copyright law.

4. This case involves remarkably simple undisputed facts. First undisputed fact: plaintiff is the owner of a registered copyright for a photograph he took of NFL superstar Tom Brady (and others) on July 2, 2016 ("the Photo"). Second undisputed fact: Advance owns two popular for-profit general-interest websites -- NJ.com and Masslive.com -- that, without any authority from plaintiff, each prominently displayed the Photo in full and in full color. Plaintiff alleges that Advance, by thus displaying the Photo, violated his exclusive right under Section 106(5) of the U.S. Copyright Act to "to display the copyrighted work publicly."

5. In dramatic juxtaposition to this case -- where Advance deliberately sought-out and prominently "showed" the Photo for its own for-profit purposes -- that 2007 case only concerned a claim of copyright infringement based on a) the presentation by Google's search engine of low-resolution "thumbnails" of copyrighted photos that its search technology indiscriminately swept-up and b) Google's providing to its visitors hyperlink "instructions" showing how they could, if they so desired, locate for themselves the full photos represented by those thumbnails.

6. Advance's primary -- if not only -- purpose in invoking that 2007 case to justify its otherwise infringing displays of the Photo is to avoid the legal responsibility that would otherwise result therefrom. Exactly contrary to Advance's proffered reading of that case,

plaintiff contends that that Ninth Circuit decision, properly read, eviscerates Advance's interpretation of it and in fact supports the view that Advance's unauthorized displays of the Photo were actionable infringements. Accordingly, in part, this case seeks a Declaratory Judgment establishing that the applicable law requires a finding that Advance's undisputed unauthorized displays of the Photo constitute infringements of the underlying copyright.

7. Set forth immediately below on successive pages are screenshots of (most of) Advance's two separate displays of the Photo:



ww.nj.com/sports/index.ssf/2016/07/nba_free_agency_rumors_celtics_brady_durant.html



-Boston is trying EVERYTHING to land a star.

New England Patriots quarterback Tom Brady joined the Boston Celtics' pitch to superstar free agent forward Kevin Durant. Yes, that Tom Brady.

> **Bill Simmons** ✓
> @BillSimmons
>
> TOM BRADY MIGHT BE AT THE DURANT MEETING AND I HAVE LOST THE ABILITY TO BREATHE AND BLINK SEND HELP NOW
>
> 3:40 PM - 2 Jul 2016
>
> ↰ ↻ 3,125   ♥ 7,906



4

Brady joins Boston Celt[ics]

ww.masslive.com/celtics/index.ssf/2016/07/boston_celtics_rumors_tom_brad.html
is page

on July 02, 2016 at 3:40 PM, updated July 02, 2016 at 7:37 PM



303 shares

The Boston Celtics hope to throw one heck of a touchdown this summer and picked a brilliant quarterback to help them do it.

According to multiple reports, the team brought New England Patriots superstar Tom Brady to the Hamptons to try pitching free agent Kevin Durant on Saturday afternoon. CSNNE's Abby Chin first tweeted a photo showing Brady with the Celtics' recruiting group, which also included Danny Ainge, Steve Pagliuca, Kelly Olynyk and Marcus Smart.



**Abby Chin** ✓
@tvabby

Follow

#Celtics breaking out the big guns for KD! TB12 in the Hamptons. @CSNNE imgur.com/Y2R1PpX

3:19 PM - 2 Jul 2016

↩  ⇄ 1,256   ♥ 1,023

5

8. Advance has effectively conceded that if it took the Photo from, e.g., a magazine or newspaper, its displays of the Photo would (at least in the absence of a "fair use" defense) constitute actionable copyright infringement, and probably willful copyright infringement. But, instead, Advance asserts that because it specifically sought-out, obtained, and displayed the Photo electronically -- through a process it calls "embedding" -- it had an immutable and perpetual free pass to prominently display the Photo as it did, along with every other copyrighted photo ever created, with no obligation to their copyright owners and with no legal consequences. (Advance is also the owner of such publications as Vogue, Vanity Fair, and The New Yorker magazines, each with its own a treasure-trove of copyrighted photographs and text, all of which will similarly be free for the taking by every website in the world if Advance prevails in this case.) To its credit, Advance has acknowledged that the legal result it will ask this Court to enshrine is "absurd."

## THE PARTIES

9. Plaintiff Justin Goldman is a citizen of the City and State of New York.

10. On information and belief Advance Publications, Inc., Advance Digital, and Advance Local are interrelated commonly-owned business entities headquartered in the City and State of New York.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§1332(a) and 1338. Venue in this district is proper pursuant to 28 U.S.C. §§1391(a) and 1400(a).

## ADVANCE'S UNTESTED 'EMBED' JUSTIFICATION

12. Advance's argument that it should not be held liable for its prominent unauthorized displays of the Photo is predicated entirely on a 2007 decision by the Ninth Circuit, Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007) ("Perfect 10"), which had nothing whatever to do with the kind of displays presented by Advance to its visitors on its for-profit editorial websites. Instead, that case involved the Google Search Engine, which made available to its visitors static "thumbnail" renditions of millions of photographs along with "instructions" on how those visitors could, if they so chose -- by "clicking" on the thumbnails -- go to the websites where full photos could be found.

13. As stated by the Court, "Google operates a search engine, a software program that automatically accesses thousands of websites (collections of webpages) and indexes them within a database stored on Google's computers. When a Google user accesses the Google website and types in a search query, Google's software searches its database for websites responsive to that search query. Google then sends relevant information from its index of websites to the user's computer. Google's search engines can provide results in the form of text, images, or videos."

14. Further, "[t]he Google search engine that provides responses in the form of images is called 'Google Image Search.' In response to a search query, Google Image Search identifies text in its database responsive to the query and then communicates to users the images associated with the relevant text. Google's software cannot recognize and index the images themselves. Google Image Search provides search results as a webpage of small images called 'thumbnails,' which are stored in Google's servers. The thumbnail images are reduced, lower resolution versions of full-sized images stored on third-party computers."

15. Further, "[w]hen a user clicks on a thumbnail image, the user's browser program interprets HTML instructions on Google's webpage. These HTML instructions direct the user's browser to cause a rectangular area (a 'window') to appear on the user's computer screen. The window has two separate areas of information. The browser fills the top section of the screen with information from the Google webpage, including the thumbnail image and text. The HTML instructions also give the user's browser the address of the website publisher's computer that stores the full-size version of the thumbnail . . . . By following the HTML instructions to access the third-party webpage, the user's browser connects to the website publisher's computer, downloads the full-size image, and makes the image appear at the bottom of the window on the user's screen. Google does not store the images that fill this lower part of the window and does not communicate the images to the user; Google simply provides HTML instructions directing a user's browser to access a third-party website. However, the top part of the window (containing the information from the Google webpage) appears to frame and comment on the bottom part of the window. Thus, the user's window appears to be filled with a single integrated presentation of the full-size image, but it is actually an image from a third-party website framed by information from Google's website. The process by which the webpage directs a user's browser to incorporate content from different computers into a single window is referred to as 'in-line linking.' [citation omitted] The term 'framing' refers to the process by which information from one computer appears to frame and annotate the in-line linked content from another computer."

16 According to the Court, "Plaintiff Perfect 10 markets and sells copyrighted images of nude models." It claimed that static thumbnail renditions of its copyrighted photos were visible on Google's Image Search, and that those renditions constituted direct copyright infringement.

17. The Court held that Google's static thumbnail renditions of Perfect 10's photos and its providing "instructions" to Google's visitors to locate full versions of the photos did not constitute direct copyright infringement. Specifically, the Court explicitly articulated (and circumscribed) its holding as follows (emphasis added): "our ruling that a computer owner does not display a copy of an image when it communicates **only** the HTML address of the copy." By so forcefully limiting its ruling to that very narrow circumstance -- "communicates **only** the HTML address of the copy" -- the Court made clear that if a website communicates (shows) more than "the HTML address," as Advance did here, that website will have indeed "displayed" the copyrighted work in question.

18. In reaching its conclusion with respect to Google's "thumbnails," which conclusion plaintiff does not dispute, the Court, addressing the specific facts before it, articulated a "server test" that held that on those facts Google's static thumbnails of Perfect's 10's photos -- which were indiscriminately swept up by Google's search technology and which were **only** shown in those static thumbnails -- were not "stored" on Google's computers and therefore could not lead to a finding of direct infringement by Google.

19. Explaining the limitations of its ruling, the Court declared: "Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the

infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen."

20. The Ninth Circuit explicitly explained why it found that Google did not violate the copyright owner's "exclusive right . . . to display the copyrighted work publicly" [17 U.S.C. 106(5)] as follows (emphasis added): "Google's activities do not meet this definition <u>because</u> Google transmits or communicates <u>only an address which directs a user's browser to the location where a copy of the full-size image is displayed. Google does not communicate a display of the work itself</u>."

21. Advance asserts that <u>Perfect 10</u>'s holding on the facts before it that "a computer owner does not display a copy of an image when it communicates <u>only</u> the HTML address of the copy" somehow <u>sub silentio</u> immunizes its own volitional full displays -- "communication" -- of the Photo on radically different facts. Some of those factual differences are:

   a. Instead of a thumbnail of the Photo, Advance prominently displayed the Photo in full and in full color.

   b. Advance provided no "instructions" of any kind to its visitors to tell them how and where to find the Photo.

   c. Advance provided no "address which directs a user's browser to the location where a copy of the full-size image is displayed."

   d. Instead of providing any such "instructions" or "address" to its visitors, so that they could -- by "clicking" -- separately choose whether or not to view the full photos represented by a thumbnail, Advance itself specifically chose to seek out the Photo, import it to its website, and display it for all visitors to its site to see, whether those visitors wanted to see it or not. In short,

Advance unilaterally did the necessary "clicking" for all its visitors.

e. While Google indiscriminately swept-up Perfect 10's photos as part of its search engine operation, and did not in any way single out those photos for its entirely passive thumbnail renditions of them, Advance singled out the Photo for its prominent displays of it on its websites.

f. While Google's business (as here relevant) is to indiscriminately and passively provide thumbnails of millions of photos that are swept-up by its search technology, Advance's business (as here relevant) is to publish for-profit editorial websites for which it selects and displays specific content to further its for-profit purposes.

g. While the Court in Perfect 10 emphasized that Google's "HTML instructions direct the user's browser to cause a rectangular area (a 'window') to appear on the user's computer screen," there is no such 'window' on Advance's prominent displays of the Photo (supra pp 4-5.)

h. Further, while the Court in Perfect 10 also emphasized that "the term 'framing' refers to the process by which information from one computer appears to frame and annotate the in-line linked content from another computer," and while Advance has asserted that its display of the Photo constituted non-infringing "framing," there is no such "framing" on Advance's prominent displays of the Photo (supra pp. 4-5).

22. Plaintiff's undersigned counsel has previously presented the following hypothetical to counsel for Advance: "A copyright lawyer walks into a bar -- named 'Remember 9/11.' At each end of the bar is an oversized computer screen, and each constantly shows (displays?) the exact same visual image: a full-screen, full-color rendition of the (much litigated) photo of the

11

flag-raising at Ground Zero.[1] The source for one computer is a 'copy' of the photo; the source for the other is a 'link' to a distant website, which may or may not have authority to offer the photo. Is one an infringement, and the other not? Can one (at least hypothetically) be enjoined, and the other not? Should these (otherwise identical) displays be treated wholly differently as a matter of copyright law?"

23. Advance's counsel candidly responded: "While your '9/11 Bar' hypothetical does a good job of showcasing how the server test can be perceivably absurd, it does not address the fact that the language of the Copyright Act [sic] does not consider in-line links to be infringing." Whether the "language" of the Copyright Act in fact mandates the admittedly "absurd" outcome urged by Advance will be the central issue to be decided by this Court in this case. (Second Circuit: "A statute should be interpreted in a way that avoids absurd results." United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000).)

24. More recently, Plaintiff's counsel presented a second hypothetical to Advance's counsel: "A company named Server, Inc. owns 500 highway billboards in the state of New Jersey, all of which are controlled by computers. The 'Trump for President' campaign -- or, alternatively, the Klan, or maybe just a prominent 'Gentlemen's Club' -- contracts with Server, Inc. to display in full and filling the entire billboards the Ground Zero flag-raising photo, possibly with a legend at the bottom saying 'Brought to you by . . . .' Instead of getting a license from the copyright owner for these 500 displays, the entity chooses the 'embed' method of acquiring and displaying the photo. Questions: Infringement? or Perfectly Legal?"

---

[1] See, e.g., North Jersey Media Group, Inc. v. Pirro and Fox News Network, LLC, 74 F.Supp. 3d 605 (S.D.N.Y. 2015), 13 Civ. 7153 (ER).

25. Instead of responding to this hypothetical -- presumably to avoid its same "absurd" characterization -- Advance's counsel advised that it would not address that hypothetical at all. Here too, if Advance is to prevail in this case, this Court will necessarily have to find that those 500 uses are "perfectly legal."

26. And here's a third (and final) hypothetical: "It is the seventh game of the World Series -- for these purposes, at Citi Field -- and during the 'seventh inning stretch' the people in charge decide -- without any authority -- to display that same flag-raising photo in full on the jumbotron, where it is seen by 50,000 people in the stadium and by 100 million people on television. Solely to avoid the (presumably high) license fee that would otherwise be required, it is decided to display the photo through Advance's 'embed' process. Questions: Infringement or Perfectly Legal?" For Advance to prevail in this case, this Court will have to find that that (humongous) display of that copyrighted photo was perfectly legal.

27. Advance's "embed" justification for its unauthorized prominent displays is, at best, a contorted, out-of-context, highly technical, and exquisitely self-serving extrapolation from that one Google "search engine" case. Except for providing a means for predatory publishers to avoid paying license fees for their increasingly rampant appropriation of copyrighted content, as in this case, Advance's "embed" justification does not even arguably serve any of the purposes of our copyright law -- or any other positive social purpose. We will leave it to Advance to explain why it seeks to make freely available through the "embed" dodge the entirety of its own truly invaluable copyrighted assets.[2]

---

[2] A few days before this Complaint was filed, Time Magazine published a "Special Edition" presenting the 100 "Most Influential Images of All Time," at least one of which was created for and first appeared on the cover of Advance's Vanity Fair Magazine. There can be no

28  Advance's prominent unauthorized displays of the Photo add no new meaning or expression to the Photo; contribute no information to the surrounding article; and is otherwise extraneous to any "reporting" function. As a consequence, Advance's uses of the Photo cannot be said to constitute transformative news reporting.

29  The purpose of Advance's prominent unauthorized displays of the Photo was solely to present the content of that image, in a commercial capacity.

30. Advance's prominent unauthorized displays of the Photo was not to, and did not, imbue it with a character different from that for which it was created.

32. Advance's prominent unauthorized displays of the Photo did not alter it at all.

33. Advance's prominent unauthorized displays of the Photo merely superseded the objects of the Photo, and did not add anything new, with a further purpose or different character, altering the Photo with new expression, meaning, or message.

34. Advance's prominent unauthorized displays of the Photo displayed the entirety of the Photo.

35. Advance was not alone in its unauthorized prominent displays of the Photo. Dozens of other websites also rushed to make their own (also unauthorized) prominent displays of the Photo. (Those other infringing displays will be the subject of separate litigation.) That widespread prominent use of the Photo demonstrates the value to those websites of those displays.

---

dispute that if a website appropriated some or all of those photos from that (print) publication, that would constitute direct infringement of the exclusive right to display them. But because those photos are also available online, http://100photos.time.com, Advance will urge this Court in this case to issue a judicial ruling that will effectively give away -- for free, in perpetuity, for all manner of commercial purposes -- all those truly iconic photos to every website (and bar, billboard, and jumbotron, etc.) that chooses to "embed" them.

36. Advance's (and others') unauthorized prominent displays of the Photo deprived Plaintiff of the license fees he would otherwise have received for such displays and otherwise caused him damage, including by depriving him of the ability to decide for himself the outlets he would authorize to display the Photo.

37. Advance is an experienced and sophisticated media enterprise that knew or should have known that its unauthorized prominent uses of the Photo was not lawful and was not "fair use."

### CAUSE OF ACTION FOR A DECLARATORY JUDGMENT

38. Plaintiff incorporates here the contents of Paragraphs 1 through 37 above.

39. Plaintiff is entitled to a Declaratory Judgment declaring that Advance's unauthorized displays of the Photo constitute actionable infringements that are not immunized from infringement consequences because it perpetrated those displays by the process it calls "embedding."

### CAUSE OF ACTION FOR WILLFUL COPYRIGHT INFRINGEMENT

40. Plaintiff incorporates here the contents of Paragraphs 1 through 39 above.

41. On the facts set forth above, Advance is separately liable to plaintiff for each of its separate willful infringements of his registered copyright in the Photo.

WHEREFORE, plaintiff demands judgment against Advance a) issuing a Declaration that Advance's unauthorized prominent for-profit displays of the Photo constituted actionable copyright infringement and that so-called "embedding" does not preclude that conclusion; b) issuing a permanent injunction preventing Advance from making any further unauthorized use or display of the Photo; c) awarding to plaintiff all appropriate damages, including statutory damages, as determined by the Court or jury; d) awarding to plaintiff Advance's profits

attributable to the infringements; e) awarding to plaintiff punitive damages; f) awarding to plaintiff his costs and attorneys' fees; and g) awarding such other relief as the Court deems just.

Dated: November 21, 2016

                            NORWICK, SCHAD & GOERING

                            By: _____
                                Kenneth P. Norwick (KN 4622)
                                110 East 59th Street
                                New York, New York 10022
                                (212) 751-4440
                                Attorneys for Plaintiff
                                ken@norwickschad.com