# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUSTIN GOLDMAN,<br><br>                     Plaintiff,<br><br>          v.<br><br>ADVANCE PUBLICATIONS, INC.,<br>ADVANCE DIGITAL, and ADVANCE<br>LOCAL,<br>                     Defendants. | No. 16 Civ. 9031 (ALC) |

**BRIEF OF GETTY IMAGES (US) INC., AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, DIGITAL MEDIA LICENSING ASSOCIATION, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, AND NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION AS *AMICI CURIAE* SUPPORTING PLAINTIFF**

Kenneth L. Doroshow
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6027
Facsimile: (202) 639-6066

*Attorney for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

INTEREST OF *AMICI CURIAE* ......................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 2

ARGUMENT ................................................................................................... 4

I.   The Physical Location or Possession of the Displayed Copy is Not Relevant to the Display Right Under the Copyright Act. ................................................... 4

II.   The Ninth Circuit's Contrary Conclusion in *Perfect 10* is Not Settled Law. ............... 6

   A.   The Server Test is Inconsistent with the Supreme Court's Intervening Decision in *Aereo*. ............................................................................ 7

   B.   The Other Cases Defendants Cite for a Supposed Judicial Consensus on the Server Test are Inapposite. ............................................................ 8

   C.   *Perfect 10* is Inapplicable to the Facts of this Case. ....................................... 11

III.   The *Perfect 10* Court's Server Test Cannot be Reconciled with the Copyright Act's Text, Structure, and Legislative History. ...................................................... 12

   A.   The Legislative History of the Copyright Act Makes Clear that the Physical Location or Possession of the Displayed Work is Irrelevant. ........... 13

   B.   The *Perfect 10* Court's Server Test is Inconsistent with the Statutory Scheme of the Copyright Act. ......................................................... 15

IV.   Important Policy Considerations Counsel Against the Server Test. ............................ 18

CONCLUSION ................................................................................................. 21

## CORPORATE DISCLOSURE STATEMENT[1]

Pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 7.1.1, *amici* state as follows:

Getty Images (US), Inc., a New York corporation that is not publicly traded, is a wholly owned subsidiary of Getty Images, Inc.  Getty Images, Inc., a Delaware corporation that is not publicly traded, is a portfolio company of the Carlyle Group L.P. (CG), a publicly traded Delaware limited partnership.  No publicly traded company owns 10% or more of Getty Images (US), Inc.'s stock.

The American Society of Media Photographers, a not-for-profit trade association, has no parent company and issues no stock.

The Digital Media Licensing Association, a not-for-profit trade association, has no parent company and issues no stock.

The National Press Photographers Association, a not-for-profit organization, has no parent company and issues no stock.

The North American Nature Photography Association, a not-for-profit organization, has no parent company and issues no stock.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.

# TABLE OF AUTHORITIES

## CASES

*American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) ...............................5, 7, 8, 20

*Corley v. United States*, 556 U.S. 303 (2009) ...............................................................................16

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007) ...................................................................................12

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012) ......................................................9, 10

*Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 3876910 (N.D. Ill. Sept. 1,
      2011), *rev'd on other grounds*, 689 F.3d 754 (7th Cir. 2012) ..................................................10

*Grady v. Iacullo*, No. 13-CV-00624-RM-KMT, 2016 WL 1559134 (D. Colo. Apr.
      18, 2016) ...................................................................................................................................10

*Hickory Grove Music v. Andrews*, 749 F. Supp. 1031 (D. Mont. 1990) ......................................17

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 C 4664, 2014 WL
      3368893 (N.D. Ill. July 8, 2014) ..............................................................................................10

*Live Face on Web, LLC v. Biblio Holdings LLC*, No. 15 Civ. 4848 (NRB), 2016
      WL 4766344 (S.D.N.Y. Sept. 13, 2016) .....................................................................................9

*MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615(CM), 2012 WL 1107648
      (S.D.N.Y. Mar. 30, 2012) ...........................................................................................................9

*Nebraska v. Parker*, 136 S. Ct. 1072 (2016) ................................................................................12

*New York Times Co. v. Tasini*, 533 U.S. 483 (2001) .............................................................5, 8, 16

*Pearson Education, Inc. v. Ishayev*, 963 F. Supp. 2d 239 (S.D.N.Y. 2013)..................................20

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) .........................3, 6, 7, 11, 15

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006), *aff'd in relevant
      part sub nom.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir.
      2007) ....................................................................................................................................11, 12

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ..........................................................................5

*Sony Corp. of American v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ............................20

*Totally Her Media, Inc. v. BWP Media USA, Inc.*, No. CV 13-08379-AB, 2015 WL
      12659912 (C.D. Cal. Mar. 24, 2015) ...................................................................................10, 11

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ...................................................17

STATUTES

17 U.S.C. § 101 ........................................................................................4, 5, 7, 8, 15

17 U.S.C. § 106(1) ...............................................................................................16

17 U.S.C. § 106(3) ...............................................................................................16

17 U.S.C. § 106(5) ..........................................................................................4, 16

17 U.S.C. § 107 ....................................................................................................20

17 U.S.C. § 110(5)(A) ..........................................................................................16

17 U.S.C. § 111 ....................................................................................................17

17 U.S.C. § 118 ....................................................................................................17

17 U.S.C. § 119 ....................................................................................................18

17 U.S.C. § 512 ....................................................................................................20

LEGISLATIVE MATERIALS

H.R. Rep. No. 90-83 (1967)..................................................................................13

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 .................5, 13, 14, 15, 17

H. Comm. on the Judiciary, 89th Cong., *Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill* (Comm. Print 1965) ..........................................14

OTHER AUTHORITIES

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.20[A] (2017) ....................16

*Terms of Service*, YouTube.com (June 9, 2010), *available at* https://www.youtube.com/ static?template=terms 21.............................................20

## INTEREST OF *AMICI CURIAE*

Getty Images (US), Inc. ("Getty Images") is one of the world's largest providers of visual content and the leading provider of images online.  Getty Images supplies imagery, video, and music to businesses and consumers for a wide variety of uses, including websites, books, newspapers, magazines, film and television production, advertisements, and product packaging. To support these endeavors, Getty Images generates revenue primarily by licensing the rights to use its content.  Getty Images originates and owns copyrights in much of the content it licenses, but it also acts as a distributor for more than 150,000 other content suppliers, including photographers, illustrators, filmmakers, media organizations, and other stock photo companies. Getty Images owns or represents more than 100 million unique works of digital imagery and was the first company to license imagery via the Internet—and currently delivers most of its content through online means.

The American Society of Media Photographers ("ASMP") is a 501(c)(6) not-for-profit trade association, established in 1944 to protect and promote the interests of professional photographers who earn their living by making photographs intended for publication. With more than 5600 members nationwide working in every genre of commercial photography, ASMP is a leading trade organization representing professional photographers' interests.

Digital Media Licensing Association, ("DMLA") is a not-for-profit trade association which represents the interests of entities who license images (still and motion) to editorial and commercial users.  Founded in 1951, its membership currently includes over 100 content image libraries globally, including large general libraries and smaller specialty libraries that are engaged in licensing millions of images, illustrations, film clips and other content on behalf of thousands of individual creators.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 6000 members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted and defended the rights of photographers and journalists, including intellectual property rights and freedom of the press in all its forms, especially as it relates to visual journalism.

Since its founding in 1994, the North American Nature Photography Association ("NANPA") has been North America's preeminent national nature photography organization. NANPA promotes responsible nature photography as an artistic medium for the documentation, celebration, and protection of our natural world and is a critical advocate for the rights of nature photographers on a wide range of issues, from intellectual property to public land access for nature photographers.

As entities that represent creators and rights owners whose work is often at the heart of material displayed on the Internet, and whose livelihoods depend critically on the existence of a meaningful right of display under the Copyright Act, *amici* have a strong interest in ensuring the proper application of copyright laws to the Internet.

## SUMMARY OF ARGUMENT

Section 106 of the Copyright Act (the "Act") confers on copyright owners the exclusive right to publicly display their copyrighted works. In their motion to dismiss, Defendants ask this Court to endorse a categorical, *per se* rule that website publishers can never directly infringe the public display right when the copyrighted work that is viewable on their website is, in fact, physically hosted elsewhere on a third-party server. As Defendants would have it, this so-called

2

"server test" would apply even when the work, through an "in-line" or "framed" link, is seamlessly integrated into the website to appear to the ordinary user as if it were hosted there, and where the true location of the work is obfuscated precisely to create that false impression.

The Copyright Act does not permit such a result.  To support their extreme view, Defendants rely entirely on the Ninth Circuit's decision in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), claiming that the decision represents long-settled law.  But the decision is *not* settled law—indeed, the server test has scarcely been applied—has never been endorsed by the Second Circuit, and is inconsistent with both the plain text of the Copyright Act and more recent Supreme Court authority.  The smattering of unpublished or out-of-circuit cases Defendants also cite is not to the contrary.

Instead, the Copyright Act's text, structure, and legislative history make plain that an individual need not obtain or reproduce a copy of a work in order to "display" it.  One infringes the display right simply by rendering that work viewable by members of the public—by whatever means, whether directly or indirectly—without the copyright owner's permission.  The statute's text makes plain that the primary consideration is whether the work has been shown to the viewer, regardless of the location from which that work is transmitted or where it is housed, and regardless of whether the defendant has caused the display to occur directly or indirectly.

There is nothing exceptional about the Internet that would call for a different approach— certainly not one so divorced from the Copyright Act's plain text and history as the "server test" for which Defendants advocate here.  If an ordinary viewer would construe the work as displayed by the website publisher, then it makes no difference that the image may be technically (and invisibly to the viewer) hosted elsewhere.

To hold otherwise would cause devastating economic consequences for the photography and visual artwork industries that *amici* represent.  By allowing website publishers to pull into their own websites images from other websites that have incurred the costs of licensing and hosting those images, the server test would eliminate any incentives for websites to pay such costs going forward and, in turn, would deprive content creators of the resources necessary to invest in further creation.  Such a result would be bad public policy and contrary to Congress' intent.  At the same time, and contrary to Defendants' unfounded warnings, enforcing the Copyright Act as written would not interfere with the robust sharing of information that the Internet enables, consistent with the balance that Congress struck between such sharing and the rights of copyright owners.  Accordingly, the Court should decline Defendants' invitation to adopt—for the first time in this Circuit—the Ninth Circuit's misguided "server test."

## ARGUMENT

## I.   The Physical Location or Possession of the Displayed Copy is Not Relevant to the Display Right Under the Copyright Act.

Section 106(5) of the Copyright Act protects a copyright owner's exclusive right to "display the copyrighted work publicly."  17 U.S.C. § 106(5).  One displays a work when he or she "show[s] a copy of it, either directly or by means of … any … device or process."  *Id.* § 101. The Act provides that one displays a work "publicly" by, among other things, "transmit[ting] or otherwise *communicat[ing]*" the work to members of the public "by means of any device or process," and further defines "'transmit' a … display" as "to *communicate* it by any device or process whereby images or sounds are received beyond the place from which they are sent."  *Id.* (emphasis added).  By the plain language of the statute, therefore, an infringer need not have obtained or reproduced his or her own copy of the work in order to "display" it, as long as he or she caused the images or sounds of the work—whether directly or indirectly, and by any "device

or process"—to be "received beyond the place from which they are sent." *Id.*; *see also* H.R. Rep. No. 94-1476, at 64 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5677 ("In addition to the direct showing of a copy of a work, 'display' would include the projection of an image on a screen or other surface by any method ….").

This reading is also consistent with the Supreme Court's admonition that, to determine whether a work is infringed under the Copyright Act, a court must "focus on the [work] as presented to, and perceptible by" the public. *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001). For purposes of the display right, then, it is the viewer's experience that matters, not the internal mechanics of how the content is stored or retrieved. As the Supreme Court observed even more recently, the Copyright Act is not concerned with the "behind-the-scenes way" that content is delivered, "invisibl[y]" to the recipient, *Am. Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2507-08 (2014), and such technical considerations are "not adequate to place [the defendant's] activities outside the scope of the Act," *id.* at 2511. Whether the displayed copy of the work resides on the defendant's server or that of a third party is therefore immaterial to the display right; the only question is whether the defendant caused the work to be viewed by members of the public, regardless of whether the defendant did so "*either* directly *or* by means of … *any* … device or process." 17 U.S.C. § 101 (emphasis added).

As alleged in the Complaint and as described in the motion to dismiss, Defendants appear to have done precisely this here.[2] Rather than direct their users to visit the third-party websites that hosted the infringing copy of the image in order to view the image in its context there,

---

[2] *Amici* assume the facts alleged in the Complaint to be true for purposes of Defendants' motion to dismiss and take no position on the merits of Plaintiffs' claims here. *See, e.g.*, *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) (on motion to dismiss, court must "accept as true all factual allegations and draw from them all reasonable inferences …").

Defendants implemented HTML code on their own websites that directed users' web browsers (invisibly to the user) to extract the image from the third-party website and to display it as an integrated part of Defendants' own websites. By any fair reading, Defendants, through a "device or process" of inline linking entirely of Defendants' own design and direction, caused the image to be viewed on their own websites and, therefore, Defendants "displayed" that image for purposes of the Copyright Act.

## II.     The Ninth Circuit's Contrary Conclusion in *Perfect 10* is Not Settled Law.

Defendants ask this Court to fashion a different rule based on the Ninth Circuit's decision in *Perfect 10, Inc. v. Amazon.com, Inc.*, and to conclude that, because Defendants did not host the infringing content on their own servers, they did not "display" it within the meaning of the Copyright Act. Contrary to Defendants' characterization, however, the so-called "server test" announced in *Perfect 10* is *not* settled law—indeed, it has scarcely been applied (and never in this Circuit)—and, in any event, it is inconsistent with subsequent Supreme Court authority. This Court should decline to follow it here.

In *Perfect 10,* the Ninth Circuit considered a claim of direct infringement of the display right against Google based on the operation of Google Image Search. Google used "in-line linking" to display full-size, infringing copies of images in its search results that were drawn from third-party websites where the images were physically stored. *See* 508 F.3d 1146, 1155-56 (9th Cir. 2007). Although Google did not store the images itself, the HTML code on Google's webpage directed the user's web browser to retrieve the images from the third-party sites and to display those images in the user's browser window. *Id.* at 1156. From the user's perspective, the "window appear[ed] to be filled with a single integrated presentation"; in actuality, however, the window

displayed an image that was hosted on a third-party website, framed by content from Google's own website. *Id.*

The Ninth Circuit concluded that Google did not display the images at issue because its computers "d[id] not store the photographic images" themselves. *Id.* at 1160. With little attempt to square its reasoning with the Copyright Act's governing language, the Ninth Circuit found that Google's use of HTML instructions to "direct a user's browser to a website publisher's computer that stores the full-size photographic image" was "not equivalent to showing a copy," even if the image appeared to the user as part of the Google website. *Id.* at 1161. Under the court's so-called "server test," whether a website publisher is directly liable for infringement of the display right turns entirely on the technical distinction of whether an image is hosted on the publisher's own server, or is instead embedded into the website's visual display from a third-party location. The Ninth Circuit was wrong, and this Court should decline Defendants' invitation to make the same mistake here.

### A.    The Server Test is Inconsistent with the Supreme Court's Intervening Decision in *Aereo*.

The Ninth Circuit's decision in *Perfect 10* is not only inconsistent with the plain language of the Copyright Act, but it also runs contrary to subsequent Supreme Court authority that rejected the very sort of technical distinctions that underpinned the Ninth Circuit's "server test." For this reason, as well, this court should refuse to adopt the server test here.

In *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014), the Court considered claims under the Copyright Act's public performance right, which is closely related to the display right.[3] In *Aereo*, an Internet-based re-transmitter of over-the-air television signals argued that it

---

[3] The Copyright Act's definitions of "display" and "perform" for purposes of the display and performance rights are materially identical. *Compare* 17 U.S.C. § 101 (defining "perform" as "to recite, render, play, dance, or act [a work], *either directly or by means of any device or process*

did not "perform the copyrighted work publicly" because each transmission technically came from a miniature antenna assigned to each user and, therefore, was a "private" rather than "public" performance.  134 S. Ct. at 2504, 2507-08.  The Court rejected that argument, noting that the technical difference "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing.  *Id.* at 2507.  "Viewed in terms of Congress' regulatory objectives," the Court asked rhetorically, "why should any of these technological differences matter?"  *Id.* at 2508.

     *Aereo* therefore teaches that it is a practical, functional perspective, and not technical considerations, that governs whether a particular mode of content delivery is infringing or not. The "server test" that Defendants champion here is wholly inconsistent with this approach.  Where a website publisher purposely constructs his or her website to show a copyrighted image as part of that website—whether through HTML instructions or "any other device or process"—it is not only the website publisher's action but ultimately the viewer's perception that matters, regardless of the true physical location of the image so displayed.

     **B.**     **The Other Cases Defendants Cite for a Supposed Judicial Consensus on the Server Test are Inapposite.**

     Defendants do not even mention the Supreme Court's *Aereo* decision in their motion to dismiss.  Neither do they mention the Supreme Court's earlier decision in *Tasini*, which also instructed that courts must "focus on the [works] as presented to, and perceptible by" the public. 533 U.S. at 499.   Instead, Defendants seek to bolster the holding of *Perfect 10* by pointing to a

---

…" (emphasis added)), *with id.* (defining "display" as "to show a copy of [a work], *either directly or by means of … any … device or process* …" (emphasis added)).

handful of lower court decisions that, contrary to Defendants' characterization of them, are inapposite here.

First, the two unpublished cases that Defendants cite from this district involved the *distribution* and *reproduction* rights, not the display right, and referenced that portion of the *Perfect 10* opinion that addressed only the distribution right, which the plaintiff in *Perfect 10* had raised separately. *See Live Face on Web LLC v. Biblio Holdings LLC*, No. 15 Civ. 4848 (NRB), 2016 WL 4766344, at *3-4 (S.D.N.Y. Sept. 13, 2016); *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615(CM), 2012 WL 1107648, at *12 (S.D.N.Y. Mar. 30, 2012) (noting that the parties disagreed about whether the defendant infringed the plaintiff's "exclusive right to 'distribute'"). Contrary to Defendants' suggestion, therefore, these cases do not endorse the server test in the context of the display right. In fact, in *Live Face on Web*, the district court refused to resolve *Perfect 10*'s application even to the distribution claim, noting that, although authority supporting the defendants' argument "may exist," the defendants had failed to "provide legal authority for their argument" and had not cited *Perfect 10*, and noting further that the question was "hardly briefed." 2016 WL 4766344, at *4-5. Accordingly, these cases provide no support for the proposition that *Perfect 10*'s server test has been adopted in this district.

Second, Defendants cite to one other Circuit court decision that they claim endorsed the server test—*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)—but that decision is also not on point. In *Flava Works*, a video bookmarking website, myVidster.com, embedded infringing videos from third-party websites, allowing users to watch those videos through a frame on myVidster, even though the videos were transmitted directly from third-party websites' servers. *Id.* at 756. Defendants claim that the Seventh Circuit "adapted the reasoning of *Perfect 10* to hold that an online video bookmarking website that embedded (rather than storing and serving) the

videos was not liable for direct infringement of the public performance right under the Copyright Act." Defs.' Mem. Supp. at 21. Not so. In reality, the court reviewed only the entry of a preliminary injunction concerning *contributory* infringement, as the court's opinion makes clear. *See Flava Works*, 689 F.3d at 761, 763 ("Flava didn't make a claim for direct infringement a basis for its motion for preliminary relief."). The server test for direct infringement of the display right, therefore, was not at issue there.[4]

Finally, Defendants cite *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, a subsequent, unpublished district court decision that relies on *Perfect 10*. Not only does that decision erroneously cite *Flava Works* as authority for a direct infringement claim, *see* No. 13 C 4664, 2014 WL 3368893, at *4 (N.D. Ill. July 8, 2014), but it was also decided mere days after the Supreme Court handed down its decision in *Aereo*. The district court's decision neither references nor distinguishes *Aereo*.[5]

---

[4] Although *Flava Works* did not involve a claim for direct infringement, the district court in that case noted that, "[t]o the extent that *Perfect 10* can be read to stand for the proposition that inline linking can never cause a display of images or videos that would give rise to a claim of direct copyright infringement, we respectfully disagree. In our view, a website's servers need not actually store a copy of a work in order to 'display' it." *Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 3876910, at *4 (N.D. Ill. Sept. 1, 2011), *rev'd on other grounds*, 689 F.3d 754 (7th Cir. 2012).

[5] The remaining two out-of-circuit and unpublished decisions Defendants cite are similarly inapposite. The first involved only allegations that a defendant infringed the copyright holder's reproduction and distribution rights, and thus is not relevant here for the same reason as the cases from this district discussed above. *See Grady v. Iacullo*, No. 13-CV-00624-RM-KMT, 2016 WL 1559134, at *5 & n.6 (D. Colo. Apr. 18, 2016). The second is from the Ninth Circuit, and naturally followed *Perfect 10*. But the case is also distinguishable because it considered a community forum, which facilitated the sharing of user-generated content and user-generated links. *See Totally Her Media, Inc. v. BWP Media USA, Inc.*, No. CV 13-08379-AB, 2015 WL 12659912, at *1 (C.D. Cal. Mar. 24, 2015). As the court explained the forum at issue there, "users entirely control the content they post" and those "few photographs actually hosted on Plaintiff's own servers are uploaded and stored solely at the direction of third-party users and linked to forum pages for display by those users." *Id.* The Ninth Circuit in *Perfect 10* was careful to note that it "d[id] not address whether an entity that merely passively owns and manages an Internet bulletin board or similar system violates a copyright owner's display and distribution rights when the users of the bulletin board or

Ultimately, this handful of unpublished or inapposite cases is hardly the tide of "long-standing law and substantial judicial consensus" that Defendants claim. Defs.' Mem. Supp. at 1. In fact, the "server test" as a measure of direct infringement of the display right remains largely an anomaly of the Ninth Circuit, and has never been applied in this Circuit.

### C.    *Perfect 10* is Inapplicable to the Facts of This Case.

Even if this Court were to find the analysis in *Perfect 10* to have some persuasive force—notwithstanding the Supreme Court's intervening decision in *Aereo*—the Ninth Circuit's reasoning in *Perfect 10* was highly fact-driven and is not applicable here. In *Perfect 10*, the technology at issue was the operation of an Internet search engine, the express purpose of which the court described as facilitating access and directing users to other locations on the Internet. According to the court, because Google Image Search operated "[m]erely to index the web so that users can more readily find the information they seek," it "should not constitute direct infringement." *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 844 (C.D. Cal. 2006), *aff'd in relevant part sub nom.*, *Perfect 10*, 508 F.3d 1146; *see also Perfect 10*, 508 F.3d at 1154 (describing the case as involving "efforts to stop an Internet search engine from facilitating access to infringing images"). As the court viewed it, application of a "server test" in that context would "maintain[], however uneasily, the delicate balance for which copyright law strives—*i.e.*, between encouraging the creation of creative works and encouraging the dissemination of information." *Perfect 10*, 416 F. Supp. 2d at 844.

---

similar system posts infringing works." *Perfect 10*, 508 F.3d at 1160 n.6.  And in concluding that there was no infringement, the court in *Totally Her Media* emphasized that, in addition to being stored on third-party websites, all of the relevant images were "*linked exclusively by third-parties*." 2015 WL 12659912, at *11 (emphasis added).  Because the present case does not involve user-generated content or links, the *Totally Her Media* case has no bearing here.

But the *Perfect 10* court conceded that its endorsement of the server test was a policy judgment based on the facts before it, and did not characterize it as necessarily appropriate for every case.  In adopting the test in that case, the court expressly acknowledged that application of the test in other settings was "susceptible to extreme or dubious results." *Id.* at 839.  Defendants here do not operate a search engine, nor do their websites serve to direct users to the true source of the image in question.  To the contrary, Defendants incorporated the image into their websites precisely to enhance *their own* websites—without acquiring a license to do so—in order to make their websites the destinations where users would view the image.  Thus, whatever sense the server test may have made on the facts of *Perfect 10*, its blanket application in cases like this one would yield "extreme or dubious results," and would be inconsistent with copyright law's overarching goal "to secure a fair return for an author's creative labor and thereby to stimulate artistic creativity for the general public good." *Davis v. Blige*, 505 F.3d 90, 104 (2d Cir. 2007) (internal quotation marks omitted).

**III.   The *Perfect 10* Court's Server Test Cannot be Reconciled with the Copyright Act's Text, Structure, and Legislative History.**

As with any question of statutory interpretation, the inquiry "begins with the language of the statute itself." *Nebraska v. Parker*, 136 S. Ct. 1072, 1079 (2016) (quotation omitted).  Beyond a bare recitation of some definitions in the Copyright Act, however, the court in *Perfect 10* made no effort to square its reasoning with the language of the statute.  As noted above, the server test cannot be squared with that language, which makes plain that one need not possess or create a copy of a work in order to "display" it. *See supra* at 4-6.  The structure and legislative history of the Copyright Act further illuminate the *Perfect 10* court's error in this regard.

12

**A.      The Legislative History of the Copyright Act Makes Clear that the Physical Location or Possession of the Displayed Work is Irrelevant.**

The legislative history of the display right confirms that the statute was intended to reach conduct like inline linking, regardless of the physical location of the copy being displayed:

> Under the definitions of "perform," "display," "publicly," and "transmit" now in section 101, the concepts of public performance and public display cover not only the initial rendition or showing, but also *any further act by which that rendition or showing is transmitted or communicated to the public.* Thus, for example: a singer is performing when he sings a song; a broadcasting network is performing when it transmits his performance (whether simultaneously or from records); a local broadcaster is performing when it transmits the network broadcast; a community antenna service is performing when it retransmits the broadcast to its subscribers; and any individual is performing whenever he plays a phonorecord embodying the performance or *communicates* the performance by turning on a receiving set.

H.R. Rep. No. 90-83, at 27 (1967) (emphasis added); *see also id.* (stating that "any act by which the initial performance or display is transmitted, repeated, or *made to recur* would itself be a 'performance' or 'display' under the bill" (emphasis added)).

Indeed, in passing the Copyright Act in its current form, Congress expressly wanted the right to sweep as broadly as possible to include "[e]ach and every method by which the images … comprising a … display are picked up and conveyed," as long as the image "reaches the public." H.R. Rep. No. 94-1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678.  With specific regard to the transmission of images on computer systems, the drafters noted that "[t]he display of a visual image of a copyrighted work would be an infringement if the image were transmitted by any method (by … for example … a computer system) from one place to members of the public located elsewhere." *Id.* at 80, *reprinted in* 1976 U.S.C.C.A.N. at 5694.  Clearly, Congress did not consider the physical location of the work displayed to be relevant to a direct infringement of the display right.

To the contrary, as the Register of Copyrights testified during the hearings that led to passage of the Copyright Act, "the definition [of the display right] is intended to cover every

transmission, retransmission, or other communication of a performance which reaches 'the public.'" H. Comm. on the Judiciary, 89th Cong., *Copyright Law Revision Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, at 25 (Comm. Print 1965). This was not limited to only the originating source that may be storing the image, but also included "any other transmitter who picks up his signals and passes them on." *Id.* at 24. The definition was thus not dependent on any one technical arrangement with regard to the storage or possession of the work, but rather was intended "to cover *every* method by which the images … can by picked up and conveyed to the public." *Id.* (emphasis added).

The breadth of the statutory definition was due, in part, to the awareness that the evolution of technology was going to make "showing" a copy of the work as important as reproduction or distribution of that copy and, thus, an essential independent right of the copyright holder. As the Register of Copyrights stated:

> [W]e have become increasingly aware of the enormous potential importance of showing, rather than distributing, copies as a means of disseminating an author's work. In addition to improved projection equipment, the use of closed- and open-circuit television for presenting images of graphic and textual material to large audiences of spectators could, in the near future, have drastic effects upon copyright owners' rights. Equally if not more significant for the future are the implications of information storage and retrieval devices; *when linked together by* communications satellites or *other means*, these could eventually provide libraries and individuals throughout the world with access to a single copy of a work by transmission of electronic images. It is not inconceivable that, in certain areas at least, "exhibition" may take over from "reproduction" of "copies" as the means of presenting authors' works to the public, and we are now convinced that a basic right of public exhibition should be expressly recognized in the statute.

*Id.* at 20 (emphasis added). Congress therefore drafted the right broadly "to include all conceivable forms and combinations of wire[d] and wireless communications media, including but by no means limited to radio and television broadcasting as we know them." H.R. Rep. No. 94-1476, at

64, *reprinted in* 1976 U.S.C.C.A.N. at 5678; *see also* 17 U.S.C. § 101 (defining "device" or "process" to include "one now known or later developed.").

Surely, a website publisher's use of HTML code to draw images from third-party servers so those images can be viewed as a fully integrated display on the publisher's own website is within the broad scope of "any … device or process" as Congress intended. The *Perfect 10* court's contrary view was based on the erroneous assumption that the location of the "fixed" work was relevant to the display right merely because "copies" are defined in the Copyright Act as "material objects … in which a work is fixed … from which the work can be perceived, reproduced, or otherwise communicated, either directly or which the aid of a machine or device." 508 F.3d at 1160 (quoting 17 U.S.C. § 101). But, as Congress made clear, the *display* of a work need not be so fixed—further confirming that the display of a work does not depend on the alleged infringer possessing a copy. *See* H.R. Rep. No. 94-1476, at 62, *reprinted in* 1976 U.S.C.C.A.N. at 5675 (explaining that "'[r]eproduction' under clause (1) of section 106 is to be distinguished from 'display' under clause (5)" because to be reproduced a work's "fixation in tangible form must be 'sufficiently permanent or stable to permit it to be perceived … for a period of more than transitory duration,'" and noting that "showing of images on a screen" would not therefore violate the reproduction right but "might come within the scope" of the display right). The *Perfect 10* court thus improperly conflated the display right with the reproduction right, leading the court to its misguided adoption of the server test.

**B.     The *Perfect 10* Court's Server Test is Inconsistent with the Statutory Scheme of the Copyright Act.**

Requiring the storage of the content in order to "display" the work, as the server test does, not only conflicts with the plain text of the definitions of the display right in the Copyright Act, but it also conflicts with the very structure of the Act.

15

For example, the Copyright Act was intended to "recast[] the copyright as a bundle of discrete 'exclusive rights,' each of which 'may be transferred … and owned separately.'" *Tasini*, 533 U.S. at 495-96 (quoting 17 U.S.C. §§ 106, 201(d)(2)) (citation and footnote omitted).  The Act protects the exclusive rights of reproduction, distribution and display separately, each of which is intended to capture distinct conduct.  *See* 17 U.S.C. § 106(1), (3), (5); *see also* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.20[A], at 8-636 to -637 (2017) (observing that one of the "important function[s] of the display right" is its application to the electronic transmission of works that "does not implicate the reproduction right").  The *Perfect 10* court's server test, however, requires that the accused infringer first have copied the work to his or her own server in order to "display" that work.  This requirement collapses the display right and the reproduction right, effectively requiring an antecedent violation of the reproduction right before the display right can be violated.  Such a result is "at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

Moreover, the *Perfect 10* court's server test conflicts with several other provisions of the Copyright Act that contemplate infringing "transmissions" by persons who neither possess nor control the physical copy from which the transmission is made.  For example, Section 110(5)(A) creates an exemption to the display right, stating that it is not an infringement to display or perform a work by receiving it on a single home apparatus, unless various other conditions are met.[6]

---

[6]  The Act states that, within certain limitations, the following is *not* an infringement: "communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless – (i) a direct charge is made to see or hear the transmission; or (ii) the transmission thus received is further transmitted to the public."  17 U.S.C. § 110(5)(A).

16

Congress passed this provision to protect copyright owners following the United States Supreme Court's decision in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975), in which the Court, prior to the 1976 Copyright Act, found no infringement of copyright when a small "fast-food" restaurant broadcast musical performances that were overheard by the public during their short stays at the establishment. *Cf. Hickory Grove Music v. Andrews*, 749 F. Supp. 1031, 1037-39 (D. Mont. 1990) (finding infringement under new Act where "sit-down" restaurant broadcast radio programs into its lobby and dining room).

The House Judiciary Committee's Report on the Section 110(5) exemption states:

> [T]he clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial "sound system" installed or converts a standard home receiving apparatus (by augmenting it with sophisticated or extensive amplification equipment) into the equivalent of a commercial sound system.

H.R. Rep. No. 94-1476, at 87, *reprinted in* 1976 U.S.C.C.A.N. at 5701.

Clearly, Congress enacted this exemption because it recognized that, without it, "commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment," would otherwise be displaying or performing the work, as the broad statutory definitions provide. However, under the *Perfect 10* court's interpretation of "display," which requires storage of the work, a proprietor's turning on a radio or television for customers would not be considered a display or performance, and therefore would not call for an exemption. The *Perfect 10* court's interpretation of the definition of "display" simply cannot be reconciled with this statutory exemption.

The same logic applies to numerous other provisions of the Act, which exempt "transmissions" that the *Perfect 10* court would not find to be transmissions at all. *See*, *e.g.*, 17 U.S.C. § 111 ("secondary transmission of a performance or display"); *id.* § 118 ("performance or

display" by noncommercial educational broadcast stations); *id.* § 119 ("secondary transmissions of a performance or display of a work embodied in a primary transmission"). The *Perfect 10* court's assumption that a transmission can have only one actionable source, therefore, and that such source must only be the place where the physical copy of the work resides, was error and cannot be squared with the Copyright Act's structure and purpose.

## IV.   Important Policy Considerations Counsel Against the Server Test.

The issue presented in Defendants' motion has implications far beyond the parties in this case. Indeed, if this Court were to endorse the server test on these facts, it would have a devastating economic impact on the photography and visual artwork licensing industries that *amici* represent—as it already has in the Ninth Circuit, where the server test has been applied.

While digital image libraries and many artists display images on their websites for licensing purposes, they rarely permit the display of large scale images without a proper license. Clients who wish to license images are generally permitted to browse and view small thumbnail images that bear identifying information such as the name of the artist, stock photo library, or other source information. Clients may use these thumbnail files only under a limited "comp license," to be shown in sample form to the end client for possible selection in a final product. These low-resolution thumbnail images are typically watermarked and cannot be downloaded without a license agreement. The license agreement defines the terms of use between the customer and the image library and is typically a precondition to any use of the image in high-resolution, large-scale format without a watermark.

Of course, the reason why clients are willing to pay for such a license is that the inclusion of high-resolution, large-scale images on their websites enhances the websites and makes them more attractive to viewers. Indeed, it is unlikely that a website without any graphic or visual images would attract many visitors. But if the server test were to apply, then website publishers

18

would have little incentive to acquire a license, as they could instead simply incorporate images through an inline link to other websites whose publishers undertook the expense of acquiring proper licenses and paying for bandwidth and other computing resources to host the image on their servers.  By eliminating direct liability for the incorporation of images in this way, the server test creates a cascading free-rider problem that severely undermines the value of copyrights in digital images and punishes those website publishers who pay for licenses and computing resources to display those images.

Indeed, under the server test that Defendants champion here, there would be no incentive to license any digital image for display on a public website beyond the very first such license. Once the first licensee posts that image to his or her website, then, according to Defendants' view, every other website in the world would be free to incorporate that image into their website's display through an inline link with impunity, and without payment of any license fees to anyone—just as Defendants are alleged to have done here.  Such a result—which would be tantamount to a judicially-sanctioned exhaustion of copyright—is bad public policy, and clearly not what Congress intended.

On the other hand, Defendants protest that enforcing the Copyright Act as written will reshape the Internet landscape and threaten copyright infringement liability for websites, bloggers, publishers, and social media users for uses that have become commonplace.  Defs.' Mem. Supp. at 3.  But Defendants' "parade of horribles" is vastly overstated, as nothing in the display right restricts the proper sharing of information on the Internet while also respecting creators' rights. Indeed, this is precisely the balance that Congress struck, but which the server test threatens to upend.

For instance, image or video embedding on the Internet will always be permissible with a license or permission—just as works may be displayed in the physical world with a license—even if uses such as Defendants' here are found to be actionable violations of the display right.  Many services can and do deal with the issue of embedding and inline linking by contract.  For example, YouTube's terms of service provide that users who submit content grant a non-exclusive license to both YouTube and its users to "use, reproduce, distribute, display and perform" that content.[7] In addition, methods of linking to content that do not result in the unauthorized display of content remain unaffected.  For example, standard text hyperlinks that direct users to view content on other sites where the content resides are not themselves an infringing use of copyrighted content.  *See Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 250-51 (S.D.N.Y. 2013).

Moreover, as with any unauthorized use of a copyrighted work, one who incorporates a copyrighted image into a website can avail him- or herself of any defenses to copyright liability that may exist on the facts of the given case.  Such defenses may include, for example, the safe harbors created by the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, and the doctrine of fair use, which permits the use of copyrighted work in some cases "for purposes such as criticism, comment, news reporting, teaching … , scholarship, or research," 17 U.S.C. § 107. As the Supreme Court recently reiterated in *Aereo*, "the doctrine of 'fair use' can help to prevent inappropriate or inequitable applications" of the Copyright Act.[8]  *Aereo*, 134 S. Ct. at 2511.  Built

---

[7] *See Terms of Service*, YouTube.com (June 9, 2010), *available at* https://www.youtube.com/static?template=terms.

[8] *Amici* note that Defendants in this case—which involves the use of allegedly infringing images in newspaper articles—appear to have raised a fair use defense, although that defense is not fully briefed in their motion.  *See* Defs.' Mem. Supp. at 11 n.9.  *Amici* take no position on the validity of that defense here.

into the Copyright Act itself, therefore, are the very safeguards that Defendants claim to need to protect legitimate uses of copyrighted content.

In the end, copyright protection is intended to "secure a fair return for an author's creative labor" and, by doing so, "to stimulate artistic creativity for the general public good." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984) (internal quotation marks omitted) (quoting *Twentieth Century Music Corp.*, 422 U.S. at 156). Contrary to Defendants' claims, the result of a broad and indiscriminate application of the server test would be *less* creative content, not more: If websites are permitted to enjoy the benefits of embedded images while shouldering none of the costs to create, produce, license, or host those images, then those who do incur those costs will have no incentive to do so in the future. With fewer such licensees willing to pay for the use of images, the copyright owners will have fewer resources to invest in further content creation, leading to the very diminution of creative output that the Copyright Act was intended to prevent.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: July 20, 2017                                  Respectfully submitted,

                                                     /s/ *Kenneth L. Doroshow*
                                                     Kenneth L. Doroshow (KD-8374)
                                                     JENNER & BLOCK LLP
                                                     1099 New York Avenue, NW
                                                     Suite 900
                                                     Washington, DC 20001
                                                     Telephone: (202) 639-6027
                                                     Facsimile: (202) 639-6066

                                                     *Attorney for Amici Curiae*