UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
JUSTIN GOLDMAN,

        *Plaintiff*,

        v.

ADVANCE PUBLICATIONS, INC.,
ADVANCE DIGITAL, and ADVANCE
LOCAL,

        *Defendants*.

------------------------------------------------------------ X

Case No. 16 Civ. 9031 (ALC)

## AMICUS CURIAE BRIEF OF NEWS MEDIA ALLIANCE, ASSOCIATION OF MAGAZINE MEDIA, ELECTRONIC FRONTIER FOUNDATION, AND PUBLIC KNOWLEDGE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Toby Butterfield, Esq.
FRANKFURT KURNIT KLEIN & SELZ PC
488 Madison Avenue
New York, NY 10022
(212) 826-5567
tbutterfield@fkks.com
*Counsel for Amici Curiae News Media Alliance,
Association of Magazine Media,
Electronic Frontier Foundation, and
Public Knowledge*

## TABLE OF CONTENTS

**Page**

I. STATEMENT OF INTEREST OF AMICI CURIAE .......................................................... 1

II. BACKGROUND ............................................................................................................... 4

III. ARGUMENT ..................................................................................................................... 6

    A. Using an In-Line Link to a Work Is Not the Equivalent of Copying and Displaying a Work .................................................................................................. 6

    B. Deviating From the Server Test Will Disrupt News Reporting and Chill the Free Dissemination of Information. .......................................................................... 8

    C. Deviating From the Server Test Will Create an Untenable Circuit Split. ............... 9

IV. CONCLUSION ................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Flava Works, Inc. v. Gunter*,
   689 F.3d 754 (7th Cir. 2012) .................................................................................................... 5

*Grady v. Iacullo*,
   2016 WL 1559134, (D. Colo. Apr. 18, 2016) ............................................................................ 5

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) .................................................................................................... 4

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*,
   2014 WL 3368893, (N.D. Ill. July 8, 2014) .............................................................................. 5

*Live Face on Web, LLC v. Biblio Holdings LLC*,
   2016 WL 4766344, (S.D.N.Y. Sept. 13, 2016) .......................................................................... 5

*MyPlayCity, Inc. v. Conduit Ltd.*,
   2012 WL 1107648, (S.D.N.Y. Mar. 30, 2012), *adhered to on recons.*,
   2012 WL 2929392 (S.D.N.Y. July 18, 2012) ............................................................................ 5

*Nakada + Associates, Inc. v. City of El Monte*,
   2017 WL 2469977, (C.D. Cal. June 2, 2017) ........................................................................... 5

*Pearson Educ., Inc. v. Ishayev*,
   9 F.Supp.3d 328 (S.D.N.Y. 2014) ............................................................................................. 5

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .................................................................................................. 4

*Totally Her Media, Inc. v. BWP Media USA, Inc.*,
   2015 WL 12659912 (C.D. Cal. Mar. 24, 2015) ........................................................................ 5

I.  **STATEMENT OF INTEREST OF AMICI CURIAE**

News Media Alliance ("NMA"), Association of Magazine Media f/k/a Magazine Publishers of America ("MPA"), Electronic Frontier Foundation ("EFF"), and Public Knowledge hereby respectfully submit this brief as *Amici Curiae* in the above-captioned case, in support the Motion to Dismiss (ECF No. 23) filed by defendants Advance Publications, Inc., Advance Digital, and Advance Local (collectively "Advance" or "Defendants").

NMA, originally known as the Newspaper Association of America, was established in 1992 and is currently the news media industry's largest trade organization. NMA's members represent nearly 2,000 diverse news organizations in the United States, from digital-only to print news, from large news organizations to local news outlets. NMA works with its members, as well as partner organizations, to advance the news industry through advocacy and critical research, focusing on issues such as freedom of the press, public policy concerns, and legal matters. Two particular areas of focus of NMA's advocacy work are intellectual property matters and technology matters.

MPA, established in 1919, is a nonprofit organization representing print and digital magazine media companies. MPA represents 265 domestic, associate, and international members, and is the primary advocate for the magazine media industry. MPA's work focuses on public policy agendas and issues that are of common concern to magazine media companies. Two primary areas of focus for MPA's advocacy work are First Amendment issues and intellectual property issues that affect the magazine media industry.

EFF is a non-profit civil liberties organization that has worked for twenty-seven years to protect consumer interests, innovation, and free expression in the digital world. EFF and its more than 36,000 dues-paying members have a strong interest in helping the courts and policymakers strike the appropriate balance between intellectual property and the public interest, and ensuring that copyright law

serves the interests of creators, innovators, and the general public. EFF is also committed to protecting online press freedom, and has worked for decades to ensure that spurious intellectual property claims are not used to limit that freedom.

Public Knowledge is a non-profit organization that is dedicated to preserving the openness of the internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully. Public Knowledge advocates on behalf of the public interest for a balanced copyright system, particularly with respect to new and emerging technologies.

*Amici* file this brief because this case presents issues of significant concern to their members, the media industry generally, and the internet users who rely on media platforms to access and share information. Plaintiff Justin Goldman asks this Court to disregard the "server test" for copyright infringement, which has been settled law for over a decade, and to instead adopt an unsupportable new standard that would allow for a flood of copyright infringement claims against essentially anyone who produces online digital content, while simultaneously encumbering individuals and media companies from referring to content posted by others without risking liability for doing so.

In this fast-paced age of digital media consumption, both media organizations and ordinary internet users who produce and share digital content – from bloggers to libraries to educators and activists – rely on the protections of the established "server test" in their everyday work, which frequently requires them to refer, via "embedded" or "in-line" links, to content on social media platforms such as Twitter, Facebook, and YouTube. Abandonment of the established server test would put all of these users at risk. With respect to the media organizations, for example, it would suddenly impose liability for copyright infringement in this jurisdiction for the industry-standard practice of using such in-

line links to others' digital content in a manner that is consistent with the terms and conditions of the hosting platform.

In-line linking from platforms that explicitly permit it is an essential part of information sharing. Social media platforms such as Twitter, Facebook, and YouTube not only have terms of use that allow for the practice of in-line linking, but also offer tools that facilitate in-line linking. Producers of digital content such as *Amici* and the users they represent do not anticipate that mere publication of an in-line link in these circumstances could result in an infringement lawsuit – particularly where that link points to content hosted on a social media platform that is entirely outside of the linker's control and that explicitly allows for (and encourages) the use of in-line links. Given that direct infringement is a strict liability tort, media companies, individuals and other entities rely on the server test to protect them from potentially crippling damages awards and to ensure that any liability is placed on the parties who actually control the posting of the material in issue.

Given *Amici's* roles in safeguarding and promoting the broad interests of the news and media industries, of journalism as an institution that exists to propagate news and information, and of the general public that depends on those industries and institutions, they can provide unique and important insights for the Court considering this issue. Accordingly, *Amici* ask this Court to grant Defendants' Motion to Dismiss.

Counsel for Plaintiff and Defendants consented to the filing of this motion. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *Amici* and their counsel, made any monetary contribution toward the preparation or submission of this brief.

## II. BACKGROUND

In-line linking is a process that creates the *appearance* that an in-lined graphic from a source website is a seamless part of a second website, but without actually copying the graphic to the second website's server. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 816 (9th Cir. 2003).[1]

The operative version of the Copyright Act was drafted in the mid-1970s and went into effect in 1978, at a time when the digital technologies of today only existed in science fiction. In the early years after technology and the internet changed the ways that people communicate and consume content, courts struggled to apply the analog principles of the Copyright Act to the realities of the digital world, and concepts that once seemed fairly straightforward – such as what it means to "reproduce" or "display" a work – became the subject of intense debate and case law.

Against this backdrop, in 2007, the Ninth Circuit issued its decision in *Perfect 10, Inc. v. Amazon.com, Inc.* A central issue in the case was whether in-line links to content that is hosted on another party's server, could be considered a "display" for the purpose of a direct copyright infringement analysis. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). The court concluded that it could not:

> Because Google's computers do not store the photographic images, Google does not have a copy of the images for purposes of the Copyright Act . . . and thus cannot communicate a copy. Instead of communicating a copy of the image, Google provides HTML instructions [via in-line linking] that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy.

---

[1] For an in-depth explanation of the technical aspects of in-line linking, please see Defendants' Memorandum of Law in Support of Motion to Dismiss (ECF No. 23), at pp. 2, 5-9.

4

*Id.* at 1160-61. This doctrine – that the owner of a website that does not *store* an image on its own server, but rather provides an *in-line link* to it, is not displaying the image for purposes of direct copyright infringement – is known as the "server test." *Id.* at 1159.

In the decade that followed the 2007 *Perfect 10* decision, courts considering this issue, including courts in this District, have likewise applied the reasoning of the server test. *See e.g. Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012); *Pearson Educ., Inc. v. Ishayev*, 9 F.Supp.3d 328, 338 (S.D.N.Y. 2014); *Live Face on Web, LLC v. Biblio Holdings LLC*, 2016 WL 4766344, at *4 (S.D.N.Y. Sept. 13, 2016); *Grady v. Iacullo*, 2016 WL 1559134, at *5 (D. Colo. Apr. 18, 2016); *Totally Her Media, Inc. v. BWP Media USA, Inc.*, 2015 WL 12659912 (C.D. Cal. Mar. 24, 2015); *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, 2014 WL 3368893, at *5 (N.D. Ill. July 8, 2014); *MyPlayCity, Inc. v. Conduit Ltd.*, 2012 WL 1107648, at *12 (S.D.N.Y. Mar. 30, 2012), *adhered to on recons.*, 2012 WL 2929392 (S.D.N.Y. July 18, 2012); *Nakada + Associates, Inc. v. City of El Monte*, 2017 WL 2469977, (C.D. Cal. June 2, 2017).

Relying on this body of law pertaining to the server test, social media platforms such as Twitter, Facebook, and YouTube have developed terms of use that explicitly authorize in-line linking to content posted to such social media platforms. Users who open accounts on these social media platforms affirmatively agree to these terms of use, which govern their submission of content, including photographs, and their use of the service. These social media platforms also now offer tools that help facilitate in-line linking, in recognition of the value of allowing information to be disseminated quickly and freely (but while still allowing the content owner a level of control over the content). Media organizations and other internet users all rely on these tools, as well as the long-settled body of law that supports such uses

5

## III.  ARGUMENT

### A.  Using an In-Line Link to a Work Is Not the Equivalent of Copying and Displaying a Work

Plaintiff's Complaint argues that a website featuring HTML code that refers a viewer's browser to an image hosted on a third party's servers (i.e. an in-line link) is functionally the same thing as the website hosting the image on its own servers and displaying the image directly. It is not.

To understand how this works, we can look to the daily practices of most media organizations. When a media organization (or other platform) hosts a copy of an image on *its own servers* and incorporates it into its online digital content (such as a news article), the media organization has direct control over what image the consumer who is viewing that online digital content sees. By contrast, when a media organization uses an *in-line link* to an image hosted on a *third party's servers* in its online digital content, the media organization does not control the image that the consumer who is viewing the online digital content ultimately sees; the third party host of the server where the image is located has the ability to continue to display that image, to replace the image with another image, or to remove the image entirely. When a media organization uses an in-line link to that image in its online digital content, any and all changes made by the third party will be instantly reflected in the content seen by reference to the in-line link.

For example, when a news organization produces an online article about a particular political event and includes an in-line link to a Twitter post (whether a "tweet" or an image) about that event, the news reporting organization runs the risk that Twitter or the Twitter user who created the post may remove that post, causing the in-line link in the online article to display

nothing, or to display a notice saying that the post has been removed. This example illustrates, from a *media organization's* point of view, the distinction between hosting and displaying a separate copy of an image on a server versus referring to a third party's server using an in-line link. Note that this distinction can also be illustrated from a *copyright owner's* point of view; the difference between the use of copies of content hosted on servers versus the use of in-line links to content is significant when it comes to copyright owners monitoring and removing infringing content. For example, if an infringing video clip is posted to YouTube, making it accessible to anyone referred to it from multiple websites, the copyright owner may send take-down requests to have the video clip removed. If a copy of the video clip exists *on the server* of each website displaying it, then the copyright owner would be required to issue multiple take-down requests to multiple websites, and would need to follow up to ensure that each website takes down its own particular copy of the infringing work. By contrast, if the video clip is accessible from multiple websites that merely use an *in-line link* to the original YouTube posting, then the copyright owner need only issue one take-down request to YouTube; once YouTube takes down its copy of the infringing work, then the video will no longer be available for viewing on all the websites that had in-line links to it. In this sense, copyright owners benefit from the prominent use of in-line links to disseminate content on the internet.

  Media organizations that use in-line linking in their online digital content often need to monitor the content on an ongoing basis in order to ensure that the in-line links are still functional, and to update their description of the content if the linked-to images are no longer displaying as first intended. In other words, these media organizations are not receiving the same benefit that they would if they hosted a copy of the image on their own servers. Thus, when deciding whether to host copies of images on their own servers or to use in-line links to

7

third parties' servers, media organizations balance their need for certainty in their content, with the desire to quickly disseminate information without risking copyright infringement claims.

### B. Deviating From the Server Test in This Context Will Disrupt News Reporting and Chill the Free Dissemination of Information.

In the decade following the *Perfect 10* decision, decision after decision has been issued adopting and applying the reasoning of the *Perfect 10* server test. *See supra* Section II. The server test is settled law, and media organizations producing online digital content, as well as social media platforms and their users, have consequently come to rely on it. The server test allows them to use in-line links to quickly and freely report on matters and to disseminate news and information to the public without the specter of crippling copyright liability looming over them.

As a practical matter, deviating from the server test in the context of social media platforms (as Plaintiff suggests this Court should) would chill the free dissemination of information and expression. It would be an enormous disruption to media organizations' ability to report on matters if suddenly they risk being charged with copyright infringement every time they provide an in-line link to material on which they are reporting. Not being able to even refer readers to the links, images, Tweets or other content being referred to would introduce ambiguity and potential confusion into public discourse. In an era when news is generated via social media websites (with social media used to garner support for protest movements, to reveal celebrity wedding and birth announcements, and now even to convey official presidential statements) and when individuals increasingly consume vital news and media online (), the media must have the ability to quickly produce and disseminate quality, informative content that utilizes in-line links, without being hampered by the threat of copyright liability for referring to them.

8

## C. Deviating From the Server Test Will Create an Untenable Circuit Split.

The scope of Plaintiff's complaint suggests that this Court should somehow address the legality of in-line linking generally, or in multiple different factual situations not presented by Defendants' actions. Courts do not and should not provide advisory opinions. While *Amici* believe the server test is the right legal and practical approach to assessing copyright liability in a variety of circumstances, this Court need not address the applicability of the server test in all circumstances. Instead, it need only consider how it applies to the allegations of this case, in which defendant provided a link to content on a social media platform whose terms of use required the content poster to explicitly authorize such in-line linking, and even offers tools that facilitate in-line linking. Should this Court choose to abandon the server test in the context of such in-line links to social media content, this will be the only jurisdiction where the common practice of using such links would constitute unlawful copyright infringement. Departing from the uniformity of rulings across circuits would put *Amici* in an untenable position, given the interconnected and ubiquitous nature of the internet. We live in a digital age, when content produced in a newsroom or studio in one state can be saved to servers in another state, and can be accessed online by media consumers in any state across the nation. *Amici's* activities would be greatly disrupted by inconsistent rulings across the United States.

Such a circuit split is also impractical, as it would be unclear when or how exactly liability would attach, under the law of this jurisdiction, to anyone using such an in-line link. For example, would liability attach if the alleged infringer media organization is headquartered in New York? Or if the media organization was formed under New York law? Or if the media organization's servers are physically located in New York? Or if the content's copyright owner is a resident of New York? Or if the content is able to be viewed or accessed in New York?

Such uncertainty and confusion can be avoided entirely by allowing the server test to remain settled law.

### D. CONCLUSION

In this fast-paced age of digital media consumption, *Amici's* members rely on courts' uniform application of the server test every day by frequently and regularly using in-line links to refer to others' content on social media platforms in a manner that is fully consistent with the terms and conditions of the platforms and the expectations of users who agree to those terms. Abandonment of this well-established test is neither justified nor required by law, would be extremely disruptive to both the media industry and ordinary internet users, and would create an untenable circuit split in which a common practice would constitute unlawful copyright infringement in this jurisdiction only. For these reasons, *Amici* respectfully request that the Court grant Defendants' Motion to Dismiss.

Dated: August 10, 2017

Respectfully submitted,

By: /s/ Toby Butterfield
Toby Butterfield, Esq.
Frankfurt Kurnit Klein & Selz, P.C.
488 Madison Avenue
New York, NY 10022
(212) 826-5567
tbutterfield@fkks.com
*Counsel for Amici Curiae News Media Alliance,*
*Association of Magazine Media,*
*Electronic Frontier Foundation, and*
*Public Knowledge*